The next case and final case this morning is Isaac Owens v. Aluminium Pharmaceuticals. Mr. O'Brien. Good morning, Your Honors. May it please the Court, Jim O'Brien on behalf of Isaac Owens, the appellant in this case. It's a fact, Your Honors, that pharmaceutical testosterone replacement therapy causes blood clots of the type that my client Mr. Owens suffered, a DVT or deep vein thrombosis. And that's not at issue today. What is at issue is whether Mr. Owens' expert, Dr. Abbas, whether his opinion stating the testim did cause his particular DVT should be excluded. And that question boils down, I believe, to two issues that are discreet. First, there is evidence that Mr. Owens was using a full dose every day in the final days leading up to his DVT. What did Mr. Owens say about that? Mr. Owens was unclear during his own testimony. He had talked about the two years prior to that one a tube every day. So he used a third to a half. Then much later in his deposition when the subject matter got to that final week before the DVT, he was asked if he continued to use it like he did before, as in the one-third to one-half. And at one moment he said he wasn't sure. He couldn't remember at a different moment, I believe. Before that he had said he guessed that he used probably that one-third to one-half. But there is other evidence leading up to that final week that what had happened was that he went to see his prescriber, Dr. Smith, and Dr. Smith had said, or Mr. Owens had said, I'm still fatigued. I'm not getting the benefit of the medication. And Dr. Smith had written in his notes that he wasn't using it as he should, wasn't using it diligently, and I give him a new prescription with instructions to use it properly. And Mr. Owens also testified that he very much trusted Dr. Smith. He still is a patient of Dr. Smith. So he would have followed his instructions from that day forward. So you'd like a jury to hear testimony from Mr. Owens to the effect that he guessed he continued as before, didn't really remember very clearly, but to infer that because he trusted his doctor, he must have changed his practices in that final week. It sounds highly speculative to me. It's an inference that we would like in our favor, Your Honor. I mean, I agree that Mr. Owens late in the day during his deposition, he was literally exhausted, but he was asked if he could go on. You made that point in the brief. Did he review the transcript? Yes, we sent it to him for the RADx process. Were there any changes made? No, Your Honor. And I don't know... So should we be worried about what his physical condition was near the end of the day, given that he had that opportunity that is such a central part of the deposition process? I'm not sure that we should worry that the deposition itself led to him saying something incorrect because he was exhausted. I think, though, that it factors into what the jury can consider. You know, when Mr. Owens is on the stand at trial, no doubt he will be presented with a prior inconsistent statement. And, you know, at that time, I assume he'll say, you know, yeah, I did say that, of course, but, you know, I was exhausted. Given the opportunity in the calmness, I mean, in the calm reflection is not allowed at trial to go back and see if that's really the truth. And he didn't change it? I'm sorry, I wasn't... He did not change the testimony? Right. No, not within the RADx period. He did not, Your Honor. I see what you're saying. That's correct. We would be relying on the inference that he would follow his doctor's instructions and that his doctor instructed him on that day. The reason you continue to be fatigued is you're not using it correctly, and that he would have corrected that right away. But separate from that, though, is the expert issue, where Dr. Abbas did, in sort of a background assumptions part, he did say that he assumed that Mr. Owens was using the medication as directed. And from that, though... Counsel, let me cut you off. Let me cut to the chase here, if I could. On this issue, I understand Dr. Abbas's theory that you rely on about dosage, is that any dose of testam was sufficient to cause Mr. Owens to have had this deep vein thrombosis, right? No, Your Honor, and if I had said that, that was mistaken. It's not any dose. It's any dose that's therapeutic. And therapeutic means that it's a dose sufficient to raise his testosterone levels into the normal range. And there may be a point where Dr. Abbas... Is that in his 26A2 report? No, in the 26A2 report, he just said that he had assumed that Mr. Owens was taking it as directed. Okay. My basic problem is, can you show us where and when you alerted the district judge to the part of Dr. Abbas's opinion that in essence improvises his response to the fact that Owens had not been taking the product properly? Where did you alert the district judge to that testimony? Well, I don't have the MSJ response here. I do. I don't see it. That we alerted the district judge... You're saying that... Your response to that point, when the defense raised the lack of fit between Abbas's assumptions and the evidence about plaintiff's use of the product, your response was what we've been talking about the last few minutes. That, well, factually, maybe he did. What I don't see in your district court summary judgment brief is any of this theory that you're relying on on appeal. But maybe I missed it. That's why I'm asking. As we stand here at the moment, I don't have that page in line. But I believe that we did raise the issue that... Counsel, excuse me. But given the debate about whether you waived this whole issue, wouldn't that seem fairly central for this argument? Well, I believe that we raised the argument, which is, we just didn't use the word therapeutic dose, that... I'm not worried about whether you used that word. I'm worried about whether you alerted the district judge to the portion of Dr. Abbas's deposition testimony that you're relying on on appeal. Well, I believe we did where we said to the district court that Dr. Abbas had said that... Dr. Abbas was questioned quite a bit about whether a lesser dose could cause a DVT. And he talked extensively about it during his deposition. And I believe that in the summary judgment response, we went back and pointed out that that lesser dose could cause... Can you direct me to those pages? I'm sorry, I cannot as I stand here, Your Honor. Thank you. What were Mr. Owen's damages in this case? He suffered the DVT, a blood clot in the leg. He was hospitalized. He was taken into urgent care, turned over to the hospital, and he was in the hospital for between 24 and 48 hours. I think it was a two-day hospitalization. He's on blood thinners after that date, and I believe he's maintained on those. Well, he presumably had been on blood thinners for a long time, right? Because he's had this before. He had had a DVT many years before, and I'm not positive, Your Honor, if he was on blood thinners at the time of this DVT or not. Can I ask you, Counsel, also, whether the defense offered any dose response evidence concerning testament? I'm not sure if they did. Narrowly within this context, I don't believe that they offered any dose response information whatsoever. I see I have 45 seconds left. May I reserve that, Your Honor? Yes, you may. If you need time to respond to the question that Judge Hamilton asked you, you may do that as well. Thank you, Your Honor. Mr. Kettenberg? Good morning, Your Honors. May it please the Court, Robert Kederberg for the appellee auxilium. Your Honors, the district court did not abuse its discretion by excluding Dr. Abbas. Dr. Abbas's opinions did not fit the facts of the case, which is a critical prerequisite for admission under Daubert. He assumed that Mr. Owens took the product in the full prescribed doses and applied it in the manner directed, but Mr. Owens testified in deposition testimony that Dr. Abbas never bothered to read, that in fact he didn't either. He took one-third to one-half the dose and put it on parts of his body that are not effective to get it into one system. Now, it was not manifestly erroneous, and that's the standard this Court uses for the district court to exclude this expert, and without expert testimony, which plaintiff agrees is necessary under Dr. Abbas. When did he start applying less than the prescribed dosage? His testimony was that he did that universally. There's testimony in the record from Mr. Owens that he, so he used one-third to one-half the prescribed dosage. He said a dime-sized amount, that was his term, and he put it on the wrong parts of his body. He put it on his abdomen and his thighs rather than his shoulder and upper arms where it's directed to facilitate... I was talking about the dosage, but you indicated he put it in a different place than prescribed as well. That, both of those are issues in this case, and both of those reduced significantly the amount of testosterone that was coming into his system below what the directed amount would have been. And without expert testimony, I think plaintiff agrees that under the applicable Kentucky law governing causation, you need scientific expert testimony to establish general and specific causation, and so there was nothing left to do at that point but for the district court to grant summary judgment. So let's turn to Dr. Abbas's opinions, and I'd like to take you through where the lack of fit comes out. In both his expert report, his 26A report and his deposition, and if you look at his expert report, which is in the record, Exhibit 5 to ECF-46, he says, here are the facts he assumed. The prescription for 50 milligrams applied daily was used by Mr. Owens as directed. That's at the top of unnumbered page 3 of Dr. Abbas's expert report. And he confirmed that understanding in his deposition. He even amplified it. So the following testimony I'm about to read is in the record as Exhibit 4 to ECF-46, and it's page 165 of Dr. Abbas's deposition. Question, so your opinion related to testosterone causing Mr. Owens' second DVT is based on the fact you understand he was taking a full dose. Answer, yes. He said the same thing with respect to the page 159 of his deposition, and again, this is also in the record. He says, my opinion as a vascular surgeon is the hypercoagulable state that occurred here with Mr. Owens is with his testosterone in his blood that was absorbed from application on the arms. He had no idea when he rendered his opinion that Mr. Owens was putting it on a non-indicated part of his body. Mr. Katterberg, let me tell you what troubles me about the case most from your side. It is perfectly routine, given the ebb and flow of civil litigation, for one side to be able to show that an expert on the other side was relying on information that may have been inaccurate in one respect or another. One case that comes to mind is Stallings against Ryobi on table saws, for example, where the expert used a 90% estimate for some qualitative, when he tried to quantify something that had been qualitative. There has got to be some play in the joints there, it seems to me, where you don't exclude the expert's testimony entirely, but you leave a lot of those sorts of mistakes and debates for cross-examination and trial. What is it about this case that you think makes it justifiable to say, no, this is too much and we are just going to take this away from the jury? In toxic torts, the dose response relationship, and I think this is the way the 11th Circuit put it in the McLean v. Metabolife case, the dose response relationship is the hallmark of the science of toxic torts. That is what it is all about. It is not some minor detail off to the side, because if the plaintiff is alleging that they were exposed to a substance or a toxin, be it in the context of a prescription drug or occupational exposure or what have you, the amount to which they were exposed, that is of central relevance. It is hugely important, and this Court has said essentially the same thing in cases like Wintz and in court, K-O-R-T-E, both cited in our brief. So it is not like the Stallings case where it was the estimate of the social cost of having a table saw without the alternative design that the expert proposed where you are hypothesizing and whether it is 90% or 100% and whether it is based on all saws or just Ryobi saws. These are fundamental foundational facts that Dr. Abbas never bothered to learn before he rendered his opinion. Did you all put any dose response evidence into the record in the district court on this? I don't believe we did, Your Honor. I am not certain of that. I believe we certainly had experts of our own. I was in trial counsel. We had experts of our own that may have been experts. So Your Honor, I want to turn to where Dr. Abbas also acknowledged in his deposition because we have seen where he said what he assumed, but he also gave testimony that if those assumptions turned out not to be true, he simply doesn't have any scientifically reliable opinions about causation to offer. So page 158, and again this is Exhibit 4 to ECF 46, question, is it your opinion that testing when applied to improper parts of the body can increase the risk of DVT? Answer, no. And on 165, a question is put to him about whether a half dose could cause DVTs, and he says, I don't know. Would it have been different? I would have to investigate it. Well, investigating is what experts are supposed to do before they render their opinions. And if we turn to the plaintiff's own testimony, the testimony is clear that he had a consistent practice that he formed when he first started using the product in 2011 of how he used the product, which was putting it on his thighs and his stomach and using the dime-sized amount rather than the full tube. The tube is designed to be used in a single consumption all at once. He said it lasted in two to three days on average, so he on average was using one-third to one-half of the amount. He never testified that he changed his practice at any point. Now, counsel referred to testimony that is at, I believe, 248 of his deposition where he equivocated a little bit. He said, I guess I was still doing the same. But there's also testimony at 248 of the deposition, and this, I believe, is Exhibit 6 to ECF 46. Question, on July 9th, and this was the first date he took the product after it was pre-prescribed, in July 2013, on July 9th, you would have applied a dime-sized amount of testam? Answer, that's correct. Now, on redirect, counsel tried to elicit from Mr. Owens testimony that after he went and saw his doctor in July 2013, he changed, he fundamentally changed how he used the product and started taking the full amount, but he wasn't able to get it. Mr. Owens simply said he didn't recall. There was never any errata filed to change that testimony, and there was never anything more, and there's no other evidence in the record other than that his universal practice was to use it in the way he did. So when you put Dr. Abbas' testimony and Mr. Owens' testimony side-by-side, the problem is that the two simply don't match. It's like the expert testimony was conceived for a different case. Now, I'd like to say a few words about this therapeutic dose argument. Let's be very clear, it's waived, and I'd say it's waived in two different but interconnected ways. It was a fundamental fairness to the district judge. The judge was never alerted to this argument, and relatedly, because it wasn't presented to the district court, the material is simply not in the record. Now, in his appellate brief, pages 16 to 22, I count five or six lengthy block quotes of a testimony from Dr. Abbas. None of that is in the record. We've checked. We've checked thoroughly. None of it is in the record. None of it was presented to the district court. Now, that one thing is there's some testimony from Dr. Abbas quoted at page 16 of their brief, and this is at the deposition at 161, where the question is, do you have an opinion on what dose of testim a person needs to increase the risk of DVT? The answer is no. And that testimony, as I've indicated, supports us. And it's not just a fragment here and a fragment there. It's the testimony that goes to the heart of this therapeutic dose argument. You'll also find that the testimony that they quote from Dr. Smith at 13 and 14 of their brief is not in the record either. The testimony about what Mr. Owens' levels were in June 2012 and December 2012, and this is the testimony that they rely on to suggest that the way that Mr. Owens was taking testim was nevertheless therapeutic for him, that is not in the record. The deposition exhibits that they rely on is not in the record. It's just none of it's there. And the reason it's not in the record, again, is because they didn't make the argument. That's because they opted to make a different argument. I see that my time is up. We ask the court to affirm. Thank you. Thank you, counsel. Thank you, Your Honors. In my remaining time, if I could address just a couple of issues very quickly. The therapeutic dose issue was first raised by Auxilium in their reply in the district court. And it was quoted, that term is quoted in the district court's opinion. So we, while we didn't raise it in our opposition to summary judgment or Daubert, it was Auxilium that first brought it into the case, not us at this court. And the, I see, Your Honors, that we'd like your answers to these. And because of your point in your brief about the therapeutic dose phrase having been raised in the reply brief, that's why I was focusing on what was introduced in the defendant's opening brief and the opposition brief in summary judgment. And that's, do you have an answer to that question? No, Your Honor. I took a look just in the last 10 minutes, but I was not able to find that point. Thank you. Thank you, Your Honors. Thanks to both counselors. The case is taken under advisory and the court will be in recess.